IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JOSE JAVIER CABRERA-BERRIOS, BETSY BERRIOS, JOSE CABRERA,<br><br>**Plaintiffs,**<br><br>v.<br><br>PEDRITO PEDROGO; JUAN J. HERNANDEZ; AGENT PAGAN; HECTOR PESQUERA; EMILIO DIAZ-COLON; JOHN DOES #1-13, MUNICIPALITY OF SAN JUAN,<br><br>**Defendants.** | **Civil No.** 13-1270 (FAB) |

**MEMORANDUM AND ORDER**[1]

BESOSA, District Judge.

Before the Court is the motion to dismiss pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) ("Rule 12(b)(6)") filed by co-defendants Hector M. Pesquera ("Pesquera"), Emilio Diaz-Colon ("Diaz-Colon"), and Pedrito Pedrogo Flores ("Pedrogo"). (Docket No. 37.) For the reasons discussed below, the Court **DENIES** defendants' motion.

I. BACKGROUND

A. Procedural History

On April 16, 2013, plaintiffs Jose Javier Cabrera-Berrios ("Jose Javier"), Betsy Berrios, and Jose Cabrera filed a civil rights complaint pursuant to the United States Constitution, the

---

[1] Matthew D'Auria, a second-year law student at the University of Virginia School of Law, assisted in the preparation of this Memorandum and Order.

Civil No. 13-1270 (FAB)                                                    2

laws and Constitution of Puerto Rico, and 42 U.S.C. § 1983 ("section 1983") against Pedrogo, Pesquera, Diaz-Colon, Juan J. Hernandez ("Hernandez"), Michelle Pagan ("Pagan"), John Does #1-13, and the Municipality of San Juan ("the Municipality"). (Docket No. 9 at p. 1.) Plaintiffs allege violations of section 1983 as well as general constitutional violations of their Fourth, Eighth, and Fourteenth Amendment rights through defendants' actions of unreasonably searching plaintiffs' house; illegally seizing Jose Javier and using excessive force and illegally detaining him; and inadequately recruiting, training, supervising, and disciplining field officers. Id.

On November 13, 2013, defendants Pesquera, Diaz-Colon, and Pedrogo filed a motion to dismiss. Pesquera and Diaz-Colon allege that plaintiffs' complaint fails to state a claim against them for which relief can be granted pursuant to section 1983. Pedrogo makes a general allegation that plaintiffs' complaint fails to state a claim for which relief can be granted, but does not address with any specificity the constitutional violations alleged in plaintiffs' complaint. (Docket No. 37 at pp. 12-14.) On December 6, 2013, plaintiffs filed an opposition to defendants' motion. (Docket No. 42.)

    B.   **Factual Background**

As required by the standard Rule 12(b)(6) analysis, the Court treats as true the following non-conclusory factual

Civil No. 13-1270 (FAB)                                                 3

allegations from the plaintiffs' complaint, see Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 10 (1st Cir. 2011):

> Plaintiffs are citizens of the United States and residents of Puerto Rico.  (Docket No. 9 at p. 2.)  Betsy Berrios is the mother of Jose Javier, and Jose Cabrera is his father.  Id.
>
> Defendants Pedrogo, Hernandez, and Pagan, badge numbers 32537, 35502 and 32140, respectively, are citizens and residents of the Commonwealth of Puerto Rico and are police officers of the Puerto Rico Police Department ("PRPD").  (Docket No. 9 at pp. 2-3.)  Defendant Pesquera was the Superintendent of the PRPD at the time of the incident and had occupied the position since March 2012.  Id. at p. 3.  Defendant Diaz-Colon was, at the time of the events in question, a resident of the Commonwealth of Puerto Rico and the Chief or Superintendent of the PRPD.  Id. Defendants John Does #1-13 are agents of the PRPD and/or the Municipality and are believed to be residents of the Commonwealth of Puerto Rico.  Id.
>
> On April 5, 2012, at approximately 3:00 - 3:30 a.m., plaintiff Jose Javier was in the kitchen of his parents' house, plaintiffs Jose Cabrera and Besty Berrios, located on Street 3, #1038, in Villa Nevarez, Rio Piedras, Puerto Rico.  (Docket No. 9 at p. 4.)  Dressed only in shorts, Jose Javier looked out from the kitchen towards the living room window and saw lights and heard a loud noise from a helicopter flying over the house.  Id. at pp. 4-

Civil No. 13-1270 (FAB)                                                          4

5. He also heard knocking on the entrance gate or door to the residence. Upon opening the garage door, Jose Javier saw several police cars and more than 10 police officers. Id. at p. 5. When Jose Javier asked the police officers why they were at the house, defendant John Doe 1 approached and grabbed him by the arm while defendant John Doe 2 placed himself directly in front of Jose Javier and asked three questions: "Who are you?"; "Do you live here?"; and "Who else is here in the house?" Id. Jose Javier did not attempt to flee the premises. Id. at p. 6. Rather, he provided his name and informed the officers that the house belonged to his parents, who were sleeping inside. Id. at p. 5. When Jose Javier asked again about why the officers were at his parents' residence, defendant John Doe 2 told him that they wanted to enter the house to search it. Id. Jose Javier asked if the officers had a warrant to search the premises, but his question went unanswered. Id. Defendant John Doe 1, still holding Jose Javier's arm, further restrained him while defendants John Does 3 and 4 surrounded him. Id. at pp. 5-6. Defendant John Doe 3 then threw himself on top of Jose Javier, knocking him to the ground. Id. at p. 6. Defendant John Doe 3 proceeded to handcuff Jose Javier, injuring Jose Javier's hand in the process. Id.

With Jose Javier handcuffed and on the ground, defendants John Does 5, 6, and 7 entered the plaintiffs' residence and began conducting a search of the premises, including Jose Javier's

Civil No. 13-1270 (FAB)                                                        5

bedroom.  (Docket No. 9 at p. 6.)  The noises created by the police officers awakened plaintiffs Betsy Berrios and Jose Cabrera, who were sleeping in their bedroom.  Id.  Jose Cabrera exited his bedroom at which time he saw defendant John Doe 5 in his kitchen. Id. at p. 7.  After asking John Doe 5 what was going on, Jose Cabrera proceeded outside, where he saw his son on the ground, handcuffed and only partially dressed.  Id.  Betsy Berrios, dressed in a nightgown, was confronted at her bedroom door by John Doe 6, who told her to get dressed and to leave the house.  Id.  While walking toward the front of her house, Betsy Berrios saw three police officers, John Does 5, 6, and 7, inside her home.  Id.  John Doe 7 was conducting a search inside her son's bedroom, while John Doe 5 conducted a search in the dining room.  Id.  As she moved towards the carport, Betsy Berrios saw her son on the ground, handcuffed, and surrounded by a group of approximately 30 police officers from both the PRPD and the Municipality.  Id. at pp. 7-8. She also witnessed a helicopter flying above and shining a light on the house. At no point during this event was Betsy Berrios shown a warrant to search her house.  Id. at p. 8.

Outside the residence, Jose Cabrera asked Pedrogo to explain what was going on.  (Docket No. 9 at p. 8.)  Pedrogo responded that the PRPD had received an anonymous call telling them that the caller had seen the passenger of an SUV shooting out of the passenger side of the vehicle while driving down Muñoz Rivera

Civil No. 13-1270 (FAB)                                                    6

Avenue.  Id.  The eyewitness had apparently followed the SUV to the plaintiffs' residence and directed the police to the home.  Id. Jose Cabrera told the officers that there must have been a mistake because his son had been alone in the car and there had been no one in the passenger side of the vehicle.  Id. at pp. 8-9.  When Pedrogo and John Does 5-8 asked Jose Cabrera and Betsy Berrios for consent to search the Toyota Highlander that was parked in the carport of the plaintiffs' residence, they did not immediately consent.  Id. at p. 8.

At that time, John Doe 9 told Betsy Berrios that the officers were going to take her son to the police station as a "preventative" [sic] measure.  (Docket No. 9 at p. 9.)  John Does 1-4 pushed Jose Javier, still minimally dressed and handcuffed, into a PRPD patrol car, and John Does 10 and 11 then brought him to the Rio Piedras police station.  Id.  During the ride to the station, Jose Javier asked the officers what was happening, but was told that he would find out what he needed to know whenever they decided to inform him.  Id.  At the station, John Does 10 and 11 placed Jose Javier in a cell without any shirt or shoes.  Id.  The toilet in the cell was in disrepair and there was a pile of feces surrounding it.  Id. at p. 13.  Jose Javier was left to urinate on the floor next to the toilet.  Id.  When he asked nearby police officers if he could call his parents or his

Civil No. 13-1270 (FAB)                                                7

lawyer, they responded by laughing and one of them said, "Look, who does this guy think he is?"  Id.

Back at the plaintiffs' residence, Jose Cabrera and Betsy Berrios continued to ask the remaining police officers, John Does 5, 6 and 7 and Pedrogo what was going on.  (Docket No. 9 at pp. 9-10.)  This time, John Doe 5 responded to Betsy Berrios that the PRPD had received a telephone call from an anonymous person who had supposedly seen someone shoot twice into the air out of the *driver's* window of an SUV while driving on Muñoz Rivera Avenue.[2]  Id. at p. 10.  John Does 5, 6, 7, and Pedrogo also offered a third version of events to Jose Cabrera, suggesting that an anonymous caller had reported seeing sparks or explosions coming from a Toyota SUV.  Id. at p. 11.  When Jose Cabrera asked the officers for further details on the anonymous caller, his request was rebuffed.  Id.

At that time, John Pablo Rivera, a friend of Jose Javier, arrived at the house in order to retrieve his car that he had parked on the street.  (Docket No. 9 at p. 11.)  Upon seeing the police officers and police vehicles outside the plaintiffs' residence, John Pablo Rivera called his father, attorney Luis Rivera, and asked him to come to the house.  Id.  When John Doe 8

---

[2] This version of events differed from the one related earlier to Jose Cabrera, who had been told that an anonymous caller had reported seeing someone shoot out of the *passenger's* side of the vehicle.

and/or Pedrogo asked Jose Cabrera for permission to search the Toyota SUV parked in the carport, Jose Cabrera responded that he would not consent to the search until attorney Luis Rivera was present.  Id. at pp. 11-12.  Once attorney Rivera arrived, Jose Cabrera authorized Pedrogo to search the Toyota SUV.  Id. at 12.  Upon searching the vehicle, Pedrogo and other police officers found nothing to corroborate the anonymous caller's story.  Id.  After completing the search, Pedrogo signed a statement that read:  "4/5/12 To Whom it May Concern:  Agent Pedrogo, 32537, is authorized to search the vehicle Toyota Highlander 2002, license plate number FAT-265, and its interior.  Signed Jose Cabrera, Lic. 996847."  Id.  The statement included an additional notation, which read:  "Nothing illegal was found in the vehicle.  Everything was in order.  Signed by Agent Pedrogo."  Id.  Upon completing this statement, Pedrogo and the remaining officers left the premises.  Id.

At approximately 7:30 a.m. on April 5, 2012, John Does 12 and 13 released Jose Javier from custody and told him that there was an ongoing investigation.  (Docket No. 9 at p. 13.)  He was also given a citation to appear at the Rio Piedras police station on May 4, 2012.  Id.  When Jose Javier complied with the terms of this citation on May 4, 2012, however, Pedrogo was not present at the station and no other police officer attended him.  Id.  He was

told that the case had not been "seen" and that the investigation was still ongoing.  Id.

Plaintiff Jose Javier claims that, as a result of the incident, he lost all sensation in part of his hand, sustained injuries to his wrist, knees, and hands, and continues to suffer pain in his right hand and wrist.  (Docket No. 9 at p. 14.)  He further claims that the incident has caused him to experience anxiety, loss of sleep, appetite, and enjoyment of life, and to become hyper-alert and anxious in the presence of police.  Id.  As a result of the incident, plaintiffs Jose Cabrera and Betsy Berrios claim that they suffer from anxiety, loss of sleep, appetite and enjoyment of life, and from recurring memories of the incident. Id.  They also claim to become hyper-alert and anxious in the presence of police, and to fear for the safety of their son.  Id.

## II. Discussion

### A. Motion to Dismiss Standard of Review

Rule 12(b)(6) allows the Court to dismiss a complaint when the pleading fails to state a claim upon which relief can be granted.  Fed.R.Civ.P. 12(b)(6).  When considering a motion pursuant to Rule 12(b)(6), a court is "obligated to view the facts of the complaint in the light most favorable to the plaintiffs, and to resolve any ambiguities in their favor."  Ocasio-Hernandez, 640 F.3d at 17.  While detailed factual allegations are not necessary to survive a motion to dismiss, "[a] plaintiff is not entitled to

Civil No. 13-1270 (FAB)                                         10

'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action." Id. at 12 (quoting Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009)). Any "[n]on-conclusory factual allegations [sic] in the complaint[, however,] must . . . be treated as true, even if seemingly incredible." Ocasio–Hernandez, 640 F.3d at 12 (citing Iqbal, 129 S.Ct. at 1951). An adequate complaint "must contain sufficient factual matter to state a claim to relief that is plausible on its face." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44 (1st Cir. 2012). The complaint need not plead facts sufficient to establish a *prima facie* case, but "the elements of a *prima facie* case may be used as a prism to shed light upon the plausibility of the claim." Rodriguez-Reyes v. Molina-Rodriguez, 711 F.3d 49, 54 (1st Cir. 2013). A court, however, may not "attempt to forecast a plaintiff's likelihood of success on the merits; 'a well-pleaded complaint may proceed even if . . . a recovery is very remote and unlikely'." Ocasio-Hernandez, 640 F.3d at 13 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007)). Overall, the relevant inquiry "focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." Ocasio–Hernandez, 640 F.3d at 13.

**B.   Supervisor Liability Pursuant to Section 1983**

Plaintiffs accuse defendants Pesquera and Diaz-Colon of violating section 1983 because they allegedly caused a breach of

Civil No. 13-1270 (FAB)                                                           11

plaintiffs' constitutional rights through inadequate supervision, training, recruitment and discipline of the defendant PRPD police officers involved in the incident of April 5, 2012.  In their opposition to defendants' motion, plaintiffs seek to substantiate that claim by citing allegations contained in a complaint filed by the United States against the Commonwealth of Puerto Rico on December 21, 2012.  Those allegations were based on a study performed by the DOJ and target "unconstitutional and unlawful activity" engaged in by the PRPD and produced through "pervasive and longstanding institutional failures."  (Docket No. 42 at p. 11.)  Plaintiffs also cite language from the settlement agreement entered into by the parties of that case as further support for plaintiffs' supervisor liability claim against Pesquera and Diaz-Colon.

The moving defendants argue that plaintiffs' supervisor liability claim must be dismissed because the allegations in the complaint do not adequately demonstrate defendant Pesquera's or Diaz-Colon's personal involvement in the alleged violation of plaintiffs' rights.

### 1.  Supervisory Liability Legal Standard

A supervisor who does not directly engage in his or her subordinate's unconstitutional behavior nevertheless may be liable under section 1983. Camilo-Robles v. Hoyos, 151 F.3d 1, 6-7 (1st Cir. 1998) (citing City of Okla. City v. Tuttle, 471 U.S. 808,

Civil No. 13-1270 (FAB)                                              12

823-24 (1985)).  A supervisor is not liable, however, under the theory of *respondeat superior*.  Id.; Iqbal, 556 U.S. 662; Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005) (citing Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 48 (1st Cir. 1999)).  Rather, "[s]upervisors may only be held liable under [section 1983] on the basis of their own acts or omissions."  Whitfield, 431 F.3d at 14.  Accordingly, to establish section 1983 supervisory liability, two prongs must be satisfied: (a) the supervisor's subordinate must have violated the plaintiff's constitutional rights; and (b) the supervisor's "action or inaction" must be "'affirmative[ly] link[ed] . . . ' to that behavior in the sense that it could be characterized as 'supervisory encouragement, condonation, or acquiescence' or 'gross negligence amounting to deliberate indifference.'"  Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008); Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996); Lipsett v. University of Puerto Rico, 864 F.2d 881, 902 (citing Bohen v. City of E. Chicago, 799 F.2d 1180, 1189 (7th Cir. 1986)); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994) (internal citations omitted).

       To establish that the supervisory defendants acted with deliberate indifference, plaintiffs must show (1) a grave risk of harm; (2) the supervisory defendants' actual or constructive knowledge of that risk; (3) that the supervisory defendants failed to take easily available measures to address the risk; and (4) an

Civil No. 13-1270 (FAB)                                                   13

"affirmative link" between the supervisory defendants' deliberate indifference and the resulting violation committed by their subordinates. Figueroa-Torres v. Toledo-Davila, 232 F.3d 270, 279 (1st Cir. 2000); Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir. 1998) (citing Manarite v. City of Springfield, 957 F.2d 953, 956 (1st Cir. 1992)); Maldonado v. Fontanes, 568 F.3d 263, 275 (1st Cir. 2009) (internal citations omitted).

Case law reveals two overarching theories sufficient to impose liability:  where the supervisor knows of, but disregards, a subordinate's risk of constitutional violations, and where a supervisor "formulat[es] a policy or engage[s] in a custom . . . that leads to the challenged occurrence."  See McIntyre v. United States, 336 F. Supp. 2d 87, 127 (D. Mass. 2004) (describing many of the scenarios in which the First Circuit Court of Appeals found that supervisors acted with deliberate indifference); Barreto-Rivera, 168 F.3d at 49; Maldonado-Denis, 23 F.3d at 582.

   **2.   Application**

Because the defendants do not challenge the first prong of the supervisory liability doctrine, the Court assumes, for the purpose of the motion to dismiss, that the field officers violated the plaintiffs' constitutional rights. At issue, then, is the second prong — whether the supervisory defendants deprived plaintiffs of certain constitutional rights by acting with

deliberate indifference or engaged in a custom that leads to the challenged occurrence.

In their complaint, plaintiffs allege only that defendants Pesquera and Diaz-Colon were responsible for administrating and directing the police department and for supervising the administrative, operational, recruitment, training, supervision and discipline of police officers.  (Docket 9 at p. 3.)  Although liability pursuant to section 1983 "cannot rest solely on a defendant's position of authority," plaintiffs' subsequent reference to the Department of Justice's 2011 report on the PRPD shifts the focus of their claims away from the Superintendent position itself to the potential acts and/or omissions of the individuals who occupied that position of authority.  Ocasio-Hernandez, 640 F.3d at 16.  Taken in conjunction with plaintiffs' allegations in the complaint, the DOJ report helps support a plausible inference that the defendants Pesquera and Diaz-Colon, as supervisors charged with implementing proper recruitment, training, supervision, and disciplinary policies, are liable for any constitutional violations suffered by plaintiffs.  Because precise knowledge of the chain of events leading to a constitutional violation may often be unavailable to a plaintiff at an early stage of civil rights litigation, a court is permitted to draw on judicial experience and common sense to make a contextual judgment about the sufficiency of the pleadings.  See Iqbal, 129 S.Ct.

Civil No. 13-1270 (FAB)                                                    15

at 1950; Ocasio-Hernandez, 640 F.3d at 12.  The Court recognizes that, at this stage of litigation, the plaintiffs do not possess exact knowledge of either Pesquera's or Diaz-Colon's activities, and, therefore, are unable to substantiate their claim of supervisory liability with more specific and detailed facts.  Accordingly, the Court exercises its common sense and judicial experience to deny defendants Pesquera's and Diaz-Colon's motion to dismiss in order to permit plaintiffs the opportunity to gather more information concerning those two defendants' possible acts or omissions leading to the constitutional violations.  Granted, plaintiffs have "a long way to go" in order to substantiate their supervisory liability claims against Pesquera and Diaz-Colon.  See Jorge v. Police Dept. of Puerto Rico, 2013 U.S. Lexis 31761 (D.P.R. 2013) (Garcia-Gregory, J.).  Nevertheless, the Court abstains from estimating the probability that plaintiffs will prevail on those claims.  Id. (citing Ocasio-Hernandez, 640 F.3d at 12).  In essence, "[t]he role of these defendants can be made clearer in discovery and nothing precludes later efforts to end the case against them should discovery not substantiate these inferences." Marrero-Rodriguez v. Municipality of San Juan, 677 F.3d 497, 502 (1st Cir. 2012).  Accordingly, defendants' motion to dismiss plaintiffs' section 1983 claims is **DENIED.**

### C. Violations of Constitutional Rights by Defendant Pedrogo

Plaintiffs allege that defendant Pedrogo violated their constitutional rights pursuant to the Fourth, Eighth, and Fourteenth Amendments while acting in his capacity as a PRPD police officer.

Defendant Pedrogo argues that plaintiffs' claims must be dismissed because Pedrogo's actions, as alleged in the complaint, "do not amount to any claim of liability that Plaintiff can proffer." Docket 37 at p. 13. He fails, however, to make any specific arguments to challenge the distinct claims brought by the plaintiffs directly. Defendant Pedrogo instead relies on a categorical denial of all claims brought against him. The Court, however, refuses "to do counsel's work, create the ossature for the argument, and put flesh on its bones . . . . Judges are not expected to be mind-readers." U.S. v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Because defendant Pedrogo advances a sweeping argument that is conclusory and woefully undeveloped, the Court **DENIES** his motion to dismiss.

### III. Conclusion

For the reasons expressed above, the Court **DENIES** defendants' motion to dismiss, (Docket No. 37).

Civil No. 13-1270 (FAB)                                                 17

**IT IS SO ORDERED.**

San Juan, Puerto Rico, May 27, 2014.

                                        s/ Francisco A. Besosa
                                        FRANCISCO A. BESOSA
                                        UNITED STATES DISTRICT JUDGE